**Affirmed and Memorandum Opinion filed February 10, 2015.**



In The

# Fourteenth Court of Appeals

### NO. 14-14-00751-CV

## IN THE INTEREST OF E.W. aka E.T.W., A CHILD

**On Appeal from the 311th District Court
Harris County, Texas
Trial Court Cause No. 2012-60752**

## M E M O R A N D U M    O P I N I O N

S.D.W. (the Mother) appeals from the decree terminating her parental rights to her son, E.W. aka E.T.W. (the Child).[1] The Mother raises three issues challenging the legal and factual sufficiency of the evidence supporting the three predicate termination grounds recited in the judgment and the trial court's finding that termination of the Mother's parental rights is in the Child's best interest. We affirm.

---

[1] To protect the identity of the minor, we have not used the names of the Child, parents, or other family members. *See* Tex. R. App. P. 9.8.

# I. BACKGROUND

The Child was born May 2, 2005.[2] On October 11, 2012, the Texas Department of Family and Protective Services (the Department) received a referral alleging that the Mother stated she had suicidal thoughts and she had a plan to kill the Child, and then kill herself. According her affidavit, the Department's caseworker, Lanitra Robinson, talked to the Child at his school the next day, and he admitted that the Mother had stated several times that she wanted to kill herself.[3] Robinson observed bruises on the Child's leg that the Child stated he received when the Mother's girlfriend, Patricia, spanked him.

Robinson then spoke with the Mother at her residence. The Mother confirmed she had suicidal thoughts and heard voices. She explained that she was seeing a counselor at the Mental Health Mental Retardation Authority (MHMRA), and she had been referred to a 24-hour suicide prevention hotline. The Mother confirmed she and the Child had been homeless after she left an abusive relationship with her previous girlfriend, Terri. She and the Child lived at Patricia's apartment at the time of the interview. During the interview, the Mother became emotional, threatened suicide, and told Robinson to leave and take the Child. Robinson then prepared paperwork for removal of the Child. When Robinson attempted to give the Mother the removal notice, she balled up the notice and threw it at Robinson. As Robinson attempted to leave with the Child, the Mother

---

[2] The Child's father was not part of the Child's life, and his whereabouts were unknown at the time of trial. The alleged father's parental rights were also terminated, but he is not a party to this appeal.

[3] Robinson's affidavit was admitted at trial to show the basis for the Child's removal. The Department's affidavit, "even if not evidence for all purposes, shows what the trial court relied on in determining whether removal was justified" due to a risk of abuse or neglect. *See In re E.C.R.*, 402 S.W.3d 239, 248–49 (Tex. 2013). The substance of Robinson's affidavit is contained in other records admitted at trial without limitation. Moreover, the Mother has not challenged the admission of evidence on appeal.

then threw Robinson's bag on the ground and told the Child to get out of the car. The Child was screaming and holding onto Robinson's jacket in fear. The Child was also crying and he told his Mother that they were trying to help her. The Child told the worker he was scared, but after they left, he stated he then felt safe.

An adversary hearing was conducted October 17, 2012. The Mother appeared at the hearing with her appointed counsel. The court found sufficient evidence to support the removal and continue the Department's temporary conservatorship. *See* Tex. Fam. Code § 262.201(b) (West, Westlaw through 2013 3rd C.S.) (listing the required findings for removal and protection of the child). By order signed October 19, 2012, the trial court also required the Mother to submit to drug testing and perform all court-ordered services. The Mother's drug test conducted after the adversary hearing showed positive results for marijuana and cocaine.

On November 29, 2012, the Department prepared a family service plan for the Mother and filed it with the court. The plan set out several tasks for the Mother to complete before reunification with the Child, including undergoing a psychological evaluation and participation in psychiatric services, providing proof of legal and consistent monthly income demonstrating the financial ability to support the Child, undergoing drug assessment and treatment, undergoing drug testing and remaining drug-free, completing parenting classes, and maintaining a stable home environment for at least six months. On December 18, 2012, the trial court approved the Mother's family service plan and ordered her to comply with its terms. The trial court conducted regular status and permanency hearings to monitor the Child's well-being and the Mother's progress in completing her court-ordered services.

By order signed April 8, 2013, the trial court appointed Child Advocates,

Inc., as guardian ad litem for the Child. Pursuant to this order, a volunteer Court-Appointed Special Advocate, referred to as the CASA volunteer, appeared at the permanency hearings held August 7, 2013, and October 2, 2013. In addition, the CASA volunteer filed reports with the trial court containing her observations and recommendations. *See* Tex. Fam. Code § 107.002(e) (West, Westlaw through 2013 3rd C.S.) (delineating the guardian ad litem's powers and duties, including the right to submit a report and testify regarding her recommendations relating to the best interest of the child and the bases for the recommendations).

Trial to the court was held January 23, 29, and 30, 2014. The Mother testified at trial on January 23 and 29, 2014. The Department's caseworker, Sarah Allen, also testified about the Child's status and the Mother's interaction with the Department during the pendency of the case. The CASA volunteer testified about her observations and recommendations. Finally, Bruce Jefferies, of the National Screening Center, provided expert testimony about the Mother's positive drug tests. At the conclusion of the trial, the court granted the Department's request for termination of the Mother's parental rights. On August 18, 2014, the trial court signed a final judgment reciting that the Mother's parental rights were terminated based on findings that termination is in the Child's best interest and that the Mother committed acts establishing the predicate termination grounds set out in subsections D, E, and O of Texas Family Code Section 161.001(1). Tex. Fam. Code §§ 161.001(1)(D), (E) & (O); 161.001(2) (West, Westlaw through 2013 3rd C.S.). The Department was appointed sole managing conservator of the Child. The Mother filed a timely notice of appeal.

## II. BURDEN OF PROOF AND STANDARDS OF REVIEW

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1)

4

of the Family Code; and (2) termination is in the best interest of the child. Tex. Fam. Code § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Only one predicate finding under section 161.001 is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003).

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007 (West, Westlaw through 2013 3rd C.S.); *accord In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*,

5

96 S.W.3d at 266. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

We consider and weigh all of the evidence, including disputed or conflicting evidence, in reviewing termination findings for factual sufficiency of the evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id*. at 109.

## III. ANALYSIS

### A. Predicate Termination Findings under Section 161.001(1)

The trial court made predicate termination findings that the Mother had committed acts establishing the grounds set out in subsections D, E, and O of Family Code Section 161.001(1), which provide that termination of parental rights is warranted if the factfinder finds by clear and convincing evidence, in addition to the best-interest finding, that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

6

. . .

    (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child; . . . .

Tex. Fam. Code § 161.001(1)(D), (E) & (O).

## B. Endangerment

In her third issue, the Mother asserts that the evidence is legally and factually insufficient to support the termination of her parental rights under Family Code Section 161.001(1)(D) and (E). Both subsections D and E of section 161.001(1) use the term "endanger." "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

Endangerment under subsection D may be established by evidence related to the child's environment. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). "Environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home. *See J.D.S. v. Tex. Dep't of Family & Protective Servs.*, ____ S.W.3d ____, No. 08-14-00191-CV, 2014 WL 4745794, at *5 (Tex. App.—El Paso Sept. 24, 2014, no pet.). A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). A parent's inappropriate, abusive, or unlawful conduct can create an environment that endangers the physical and emotional well-being of a child, as required for termination under subsection D. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).

Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied).

In evaluating endangerment under subsection D, we consider the child's environment before the Department obtained custody of the child. *See In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). However, under subsection E, courts may consider conduct both before and after the Department removed the child from the home. *See Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) (considering persistence of endangering conduct up to time of trial); *In re A.R.M.*, No. 14-13-01039-CV, 2014 WL 1390285, at *7 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (considering parent's pattern of criminal behavior and imprisonment through trial).

Because subsections D and E both concern endangerment and the evidence on each may overlap in some respects, we address both of these predicate findings together. Our record contains evidence supporting the trial court's endangerment

findings as set out below.

### *1. Abusive Conduct and Criminal Behavior*

Abusive or violent conduct can produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment."). The Mother had prior cases in which the Department investigated abuse allegations. The Mother acknowledged at trial that the Department had investigated an allegation of abuse of the Child in August 2007. The Department investigated another allegation of neglectful supervision by the Mother in 2009. Both of these cases were "ruled out." In addition, a referral to the Department in May, 2011, alleged the Mother put the Child at risk while "engaging in domestic violence." The caseworker testified it was ruled "reason to believe," but the record contains a reference that this allegation was also ruled out.

The Department's caseworker testified she was concerned about the Mother's pattern of engaging in relationships involving domestic violence. The Mother testified that during her previous relationship with Terri, with whom she and the Child lived for about a year, the Department investigated an allegation that Terri hit the Child, who was then two years old. The Mother acknowledged Terri used cocaine and the couple argued. She at first denied there had been instances of domestic abuse, but she later acknowledged the arguments "got physical." The Mother stated she did not recall who struck whom.

In addition, evidence was admitted at trial concerning the allegation that Patricia had left marks on the Child after a spanking. The Department's caseworker testified at trial that the abuse allegation was found "reason to believe." The Mother later claimed that the Child hurt his leg while learning to ride a bicycle,

9

and she explained that the Child did not always tell the truth. The Mother acknowledged her relationship with Patricia was unhealthy and they argued over money. The Mother and Patricia separated shortly after this case commenced. The Mother testified that she broke up with Patricia because of "false allegations that she [Patricia] had hit him [the Child], but she [Patricia] didn't."

The CASA volunteer testified that from the time the Child was two, the Mother had "no fewer than three violent partners." The Mother acknowledged at trial that she had left "a lot of relationships" in an effort to protect the Child. The Mother admitted to the CASA volunteer that her partners had been violent, but the volunteer did not believe the Mother had any insight about the effect that violence had on the Child. Although the Mother testified that she was not in a relationship at time of trial, the trial court reasonably could have considered that the Mother's pattern of engaging in violent personal relationships would continue in the future. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also In re J.O.A.*, 283 S.W.3d at 346 (deferring to trial court to weigh evidence of recent improvements, especially of short duration, against probative value of irresponsible choices).

The CASA volunteer testified that the Child is very protective of his Mother. In the CASA volunteer's opinion, the Child is a victim of emotional and physical abuse. The relationship with his Mother is "inappropriate" and "unhealthy." The caseworker was also concerned that the Child "parented" the Mother, and the relationship was not good for the Child's emotional health. Caseworker Allen agreed with this assessment.

In addition, the record reflects the Mother had anger issues. The Mother acknowledged that she and her domestic partners had loud arguments, but the "screaming" was not directed at the Child. She acknowledged her angry behavior

10

with the Department's caseworker when the Child was removed. The Mother also admitted at trial to raising her voice and cursing at a court hearing early in the case. In addition, the CASA volunteer testified that she had observed the Mother's angry outburst after court on August 13, 2013, when the Mother was asked for information about the Child's previous care. The volunteer believed that conduct showed the Mother had not learned from her anger management classes and other court-ordered services.

The record also reflects that the Mother had a 2006 conviction for misdemeanor assault and she was charged with assault on a family member in May, 2011, but the charge was dismissed. In addition, evidence was admitted at trial showing that the Mother has several other misdemeanor convictions, and she had been jailed for fighting. Evidence of criminal conduct, convictions, and imprisonment and the effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d at 492.

This evidence of domestic violence, emotional abuse of the Child, and criminal activity supports the trial court's endangerment findings.

### 2. Unstable Mental Health, Including Threats of Suicide

"[W]hen a parent's mental state allows [her] to engage in conduct which endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights." *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) (considering mother's schizophrenia and resulting suicidal thoughts, hospitalizations, and violence as evidence of endangerment). A parent's unsuccessfully treated mental illness can expose a child to endangerment and is a factor the court may consider. *See Maxwell v. Tex. Dep't of Family & Protective Servs.*, No. 03–11–00242–CV, 2012 WL 987787, at *10 (Tex. App.—Austin Mar. 23, 2012, no pet.) (mem. op.); *In re*

*L.L.F.*, No. 02–11–00485–CV, 2012 WL 2923291, at *15 (Tex. App.—Fort Worth July 19, 2012, no pet.) (mem. op.) (considering a parent's failure to take medication to treat mental health issues as a factor in creating an environment that endangers the child's emotional or physical well-being); *In re J.I.T.P.*, 99 S.W.3d at 845 (considering a parent's mental health and noncompliance with her medication schedule as factors in endangering the child). Mental illness alone, however, is not grounds for terminating the parent-child relationship. *See Maxwell,* 2012 WL 987787, at *9.

The Mother's history of mental illness includes threats of suicide and a threat to kill the Child. Threats or attempts to commit suicide may contribute to a finding that the parent engaged in a course of conduct that is detrimental to a child's physical or emotional well-being. *See In re A.M.C.*, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.). During the Department's investigation, the Mother admitted to suicidal thoughts and acknowledged hearing voices. At trial, the Mother claimed she was "stressed," but not suicidal or homicidal.

When the Department interviewed the Mother at her residence in October, 2012, the Mother cried and screamed that she should kill herself. The Mother became angry, and told the Department's caseworker that they could take the Child because it would "do [her] a favor." The Mother balled up the removal notice and threw it at the Department worker. As the worker attempted to leave with the Child, the Mother grabbed the worker's computer bag and threw it on the ground. The Child urged his Mother to calm down, stating, "she is trying to help you, stop, calm down." The Child screamed, cried, and told the caseworker he was afraid. As they drove away, the Child stated to the caseworker, "I feel safe now." The Mother admitted her actions at trial but denied telling the caseworker to take the Child.

The Mother had been hospitalized several times just prior to and during the

pendency of these proceedings. In May 2012, the Mother was admitted to St. Joseph's Hospital for depression, and she was admitted to Riverside General Hospital on December 27, 2012. The Mother stated she went to the hospital in December for anger management classes. In September 2013, a few months before trial, the Mother was admitted to St. Joseph's Hospital after experiencing hallucinations and anxiety. The Mother acknowledged she was in a "critical state and needed immediate help." She was discharged after about two weeks.

The Mother claimed she was first diagnosed with major depression and prescribed medication in May 2012, when she was hospitalized at St. Joseph's Hospital. Records admitted at trial revealed a much longer duration. In November, 2012, during an evaluation by the Children's Crisis Care Center (4C's) as part of her court-ordered family service plan, the Mother stated she had been diagnosed with depression when she was eighteen. During the interview, the Mother's mood changed rapidly and she became agitated and seemed confused. The 4C's evaluator determined the Mother had "a high level of emotional instability." The Mother stated she had attempted suicide when she was thirteen or fourteen by taking an overdose of medication. Records admitted at trial also referred to another of the Mother's suicide attempts by overdose in 2006.

The Mother began receiving services at MHMRA in Houston shortly before this case began. In September 2012, the Mother sought psychiatric care at MHMRA because she was depressed and hearing voices. The Mother complained of multiple stressors, including facing eviction, lack of any support system, insomnia, cannabis abuse, and concern that her son had a possible psychiatric illness. MHMRA provided the Mother a treatment plan, including referring her to a substance abuse support group and continuing medication. On October 11, 2012, during an interview at MHMRA about assistance with rent payments, the Mother

stated she was tired and wanted to kill herself. When asked if she had a plan for ending her life, she responded, "yes," and she said, "kill my son first and then myself." The Mother's statements led to the referral to the Department in October 2012, that initiated this case.

On January 22, 2013, the Mother began family counseling with Achor Counseling and Associates (Achor). In April, the Mother missed an appointment and could not be contacted because her phone was disconnected. It was recommended that the Mother complete family counseling, but the evaluator was "not sure [the Mother could] parent [the Child] on her own until her mental health condition changed or she is stabilized."

The Mother provided two identical letters from MHMRA confirming her treatment. The letters are dated June 18, 2013, and August 13, 2013, and state that the Mother is diagnosed with "Major Depressive Disorder," which "requires ongoing treatment with medication and additional supportive services." The letter listed the Mother's psychotropic medications and stated she was "currently stable in treatment." The Mother was admitted to St. Joseph's Hospital soon after the second letter, while experiencing hallucinations and anxiety.

The caseworker testified that the Mother was not consistent in taking her medication during the pendency of the case. She believed the Mother was off her medication during episodes when her temper was uncontrolled. The CASA volunteer also testified that she believed the Mother was not following her therapists' recommendations and taking her medication as prescribed. It did not appear to the volunteer that the Mother's mental health needs were being met. Both the CASA volunteer and the Department's caseworker discovered in July 2013 that the Mother's prescription bottles were full and dated the previous year. The Mother first claimed she re-used the bottles, then she stated that she had stopped taking her

medication while taking a new medication for nerve damage to her hand. The Mother claimed at trial that she was only off her medication one time, during December 2013. She then said it happened twice. Just before trial, the CASA volunteer acknowledged that she counted the pills in the Mother's prescription bottles and they were "accurate." As the finder of fact, the trial court was entitled to discredit the Mother's testimony regarding her compliance with her mental health treatment and medication regimen. We cannot weigh a witness's credibility, a matter within the fact finder's province. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

The Mother has no family and little support to assist her in caring for the Child. She testified the only persons she could contact for help were her Narcotics Anonymous sponsor or her oldest son's paternal grandmother, Margie, who lives in Tyler. When she is in crisis, she said she contacts the MHMRA hotline or her sponsor. She has also contacted St. Joseph Hospital as part of her MHMRA crisis plan. When the Mother was admitted to St. Joseph's Hospital in September 2013, for hallucinations and anxiety, the Mother testified she did not know who could have taken care of the Child if he had lived with her at that time. The Mother later stated she would have contacted Margie to care for him. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

The caseworker acknowledged that the Mother had shown some improvement in the last three months, although her moods were not consistent. The trial court reasonably could have determined that any evidence of recent improvement in the Mother's condition was short lived and outweighed by the Mother's long history of mental illness, threats of suicide, a threat to kill the Child,

the number hospitalizations, and her failure to strictly comply with her medication. *See In re J.I.T.P.*, 99 S.W.3d at 845 (considering that mother had recurrent depression, borderline personality disorder, post-traumatic stress syndrome, partial complex seizures, thoughts of suicide, and was not compliant with medications as evidence of endangerment). This evidence of the Mother's inability to stabilize her mental health problems supports the trial court's endangerment findings.

### 3. Drug Use

The Mother acknowledged regular drug use. A parent's drug use can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.*, 283 S.W.3d at 345; *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

The Mother admitted she used marijuana, cocaine, and drank during 2009 after she stopped living with Terri. She reported to mental health evaluators that she did not feel that her use of marijuana "hurt her ability to function or to care for her child." The Mother's drug tests were positive for cocaine and marijuana for the first three drug tests in 2012 and early 2013. Bruce Jefferies of the National Screening Center provided expert testimony that the early tests indicated "chronic" use of marijuana, but only a one or two-time use of cocaine during the testing period. The Mother's positive test for a high level of marijuana in December 2012 confirmed that she had not stopped using the drug at that time. Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *Cervantes–Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc).

In April 2013, the Mother's hair follicle test was positive for marijuana and cocaine. According to Jefferies, the level was lower for marijuana, but it still

indicated some use. The Mother's August 2013 urine test was clean, but the hair sample showed a trace of cocaine. The Mother testified at trial that her drug tests were positive because she "was coming off the drug."

The Mother testified that a recent drug test by MHMRA was clean. The CASA volunteer also acknowledged that a recent test showed the drugs were out of the Mother's system. The MHMRA report showing negative results of the Mother's urinalysis in April 2013 was admitted at trial. In addition, a negative drug test report from September 2013 was admitted at trial.[4]

In sum, the Mother has a history of mental illness that created a dangerous environment for the Child and has not been successfully managed during the pendency of this case, a history of drug use, and a history of violent personal relationships, all of which support the trial court's endangerment findings. Reviewing all the evidence in the light most favorable to the endangerment findings, we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the termination findings under section 161.001(1)(D) and (E). We further conclude that, in light of the entire record, any "disputed evidence that a reasonable fact finder could not have credited in favor of the endangerment findings is not so significant that a fact finder could not reasonably have formed a firm belief or conviction" as to the truth of these termination findings. *See In re H.R.M.*, 209 S.W.3d at 108. As such, the evidence is both legally and factually sufficient to support the termination findings under Family Code Section 161.001(1)(D) and (E). We overrule the Mother's third issue.

Having determined that the evidence is sufficient to support the trial court's finding on these statutory grounds, we need not consider whether the evidence would support subsection O—the other predicate ground for termination

---

[4] The report, admitted without objection, does not state where the testing was performed.

challenged in the Mother's second issue. *See In re A.V.*, 113 S.W.3d at 362 (affirming termination decree based on one predicate without reaching second predicate found by the trier of fact and challenged by the parent).

## C. Best-Interest Finding Under Section 161.001(2)

In her first issue, the Mother asserts the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the Child's best interest. The primary focus of parental-rights termination proceedings is protecting the best interest of the Child. *In re A.V.*, 113 S.W.3d at 362. We review the entire record in deciding a challenge to the court's best-interest finding. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that the best interest of a child is served by keeping the child with  the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d at 533. Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a) (West, Westlaw through 2013 3rd C.S.).

Courts may consider the following nonexclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding, including: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exhaustive, and evidence is not required on all of the factors to

18

support a finding terminating parental rights. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533.

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. Tex. Fam. Code § 263.307(b) (West, Westlaw through 2013 3rd C.S.); *In re R.R.,* 209 S.W.3d at 116.

### 1. Present and Future Physical and Emotional Danger to the Child

We begin our analysis by noting that evidence supporting termination under one of the grounds listed in section 161.001(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(1) grounds and best interest). Evidence of endangerment supports the trial court's finding that termination is in the best interest of the child. *In re U.P.*, 105 S.W.3d 222, 231 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). A parent's drug use also supports a finding that termination is in the best interest of the child. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). The factfinder can give "great weight" to the "significant factor" of drug-related conduct. *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.); *see also In re J.N.H.*, No. 02–11–00075–CV, 2011 WL 5607614, at *8 (Tex. App.—

19

Fort Worth Nov. 17, 2011, no pet.) (mem. op.) (considering a parent's criminal and drug histories in affirming a trial court's decision that termination was in the best interest of a child). Thus, it is appropriate to consider at the outset the evidence recited above relevant to endangerment.

The CASA volunteer filed a report recommending termination of the Mother's parental rights, and she testified that the Mother's positive drug tests and evidence that illegal drugs had been used around the Child supported her belief that adoption would be in the Child's best interest. She believed the Child had been exposed to abuse, not only by the Mother's actions, but also by others with access to the Child. The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *In re M.R.J.M.*, 280 S.W.3d at 502. We acknowledge the Mother's testimony that she no longer used marijuana or cocaine. The factfinder may determine that a parent's changes shortly before trial, however, are too late to have an impact on the best-interest determination. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied). Furthermore, we may not disturb the trial court's credibility determination, which is solely within the fact finder's province. *See In re J.P.B.*, 180 S.W.3d at 573.

### 2. Stability and Compliance with Services

Evidence of a parent's unstable lifestyle also can support a factfinder's conclusion that termination of parental rights is in the child's best interest. *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.). Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs. *See In re G.M.G.*, 444 S.W.3d 46, 59–60 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso

2000, pet. denied) (holding that a parent's failure to provide a stable home and provide for a child's needs contributes to a finding that termination of parental rights is in the child's best interest).

### a. Stability of Living Arrangements

The evidence reflects that the Mother lacked stable living arrangements for the Child both before and throughout the pendency of this case. The Department provided evidence the Mother and the Child lived with the Mother's different romantic partners and experienced at least one period of homelessness.

The Mother acknowledged at trial that she had had three residences since the case began. She denied that there had been periods of homelessness, however. The Mother and the Child resided at Patricia's apartment at the beginning of the case. The Department provided a copy of the lease to the apartment where they were living at the outset of this case that showed they moved there in June 2012. The Mother and the Child continued to live in the apartment Patricia had rented for several more months after Patricia moved out when the relationship ended. The Mother told the caseworker Patricia continued to help her pay the rent. After moving from Patricia's apartment, the Mother obtained an apartment or duplex of her own, but she was unable to pay the rent. The Mother admitted she used the Child's name and social security number to set up an account with the electricity provider. She acknowledged that it was not appropriate to do so. A copy of correspondence from the utility provider showing the account in the Child's name was admitted at trial.

In October, the Mother advised the Department that she was moving to a shelter because rent was not paid on the apartment she had leased in August. On October 31, 2013, she moved into the Star of Hope shelter and sought assistance in obtaining housing. At trial, the Mother testified she had resided at the Star of Hope

shelter for two and a half months, and she acknowledged she was required to leave by January 31, 2014, two days after completion of the trial. The Mother testified she was receiving assistance from the Salvation Army and MHMRA to obtain an apartment, but the process was not completed by the time of trial. The Mother failed to provide a copy of a lease, as required by her plan. She furnished an undated letter from the shelter manager confirming the shelter's assistance in obtaining an apartment for the Mother. The letter stated the Mother had applied for an apartment and it had been approved, but the letter lacks specifics about when the apartment would be available. The Mother testified at trial that the Child could stay with her at the Star of Hope shelter until her new apartment is ready. She argues the Star of Hope housing is safe and stable. She stated the shelter has an on-site doctor, classrooms, and daycare, and "they just help with everything." The caseworker acknowledged that she toured the facility and found no safety concerns.

The Mother therefore argues on appeal that she had satisfied the service plan requirement regarding housing. We disagree. Specifically, the plan required the Mother to

> obtain and maintain a stable home environment for at least 6 months that is safe and appropriate for [the Child.] . . . This task begins on December 1, 2012 and is ongoing throughout the life of this case. [The Mother] will provide the caseworker with a copy of the lease agreement no later than December 1, 2012. [The Mother] understands that stability of residence is evaluated prior to consideration of Reunification. Proof of lease/rental agreement or mortgage should be made available to [the Department] as well as the contact information for a landlord or apartment manager if leasing or renting.

The caseworker acknowledged receiving copies of leases for the Mother's two previous residences. Even though the Mother resided at Patricia's apartment more than six months, she no longer resided there at the time of trial. The

caseworker testified that the plan's requirement for stability was "ongoing." Thus, a previous residence does not establish a stable environment. The home environment was also required to be "appropriate" for the Child, and maintained for at least six months. The Star of Hope shelter provided a temporary safe place. Under the facts and circumstances of this case, the Mother's residence for almost three months at the Star of Hope shelter does not satisfy the plan's requirement. The Mother's residence at the Star of Hope was not "stable;" the Mother was required to leave the Star of Hope within two days of trial. The caseworker testified that she was concerned that the Mother's residence at the Star of Hope lacked stability because it is a "temporary place" to help women get back on their "feet into their own place." In the CASA volunteer's opinion, the Mother had "demonstrated no insight into how to change to be a more stable parent."

The CASA volunteer filed a report recommending termination of the Mother's parental rights because the Mother had not demonstrated she had learned from the services she completed or that she could provide a safe and stable home for the Child. A child's need for permanence through the establishment of a "stable, permanent home" has sometimes been recognized as the paramount consideration in a best-interest determination. *See In re K.C.*, 219 S.W.3d at 931.

### b. Financial Ability to Provide for the Child

In addition, the Mother had not demonstrated that she had the financial ability to provide for the Child. The Mother's service plan specifically required the Mother to:

> provide the agency with proof of [the Mother] being able to care for [the Child] financially; this means being able to provide food, clothing, and a safe, appropriate home environment for herself and the child. [The Mother] agrees to provide the CPS caseworker proof of income documentation no later than December 1, 2012; and

understands that stability of income is evaluated relative to her ability to provide for the child's basic needs. Monthly income must be legal and consistent. Documentation of any additional sources of income (i.e. government assistance programs, child support, etc.) should also be made available to CPS. [The Mother] will notify CPS of any changes in employment within 72 hours of the change by contacting [the caseworker]. This task begins on December 1, 2012 and is ongoing throughout the life of this case.

At the time of trial, the Mother was unemployed. The Mother acknowledged at trial that she could not raise a child without a job, but she stated she was in the process of getting help. She testified she had a job interview the Friday before trial. Although the Mother testified she is a Certified Nursing Assistant (CNA), she admitted she worked only a month or two during the fifteen-month period the case was pending. The Department's records state that the Mother informed the caseworker in February 2013, that she had obtained a job as a home health care worker. The caseworker stated that the Mother did not provide pay stubs or other evidence of employment, and the worker was not able to verify her employment.

The Mother testified that the Child received social security income in the form of disability payments due to his diagnosis of attention deficit hyperactivity disorder (ADHD). She acknowledged that she had continued to receive these payments despite the fact that the Child was not in her care. The Mother also acknowledged her only income consisted of back child-support payments for another child who did not live with her, this Child's social security income disability payments of about $530 per month, and food stamps. The Mother testified at trial that she received $135.00 every two weeks as back child support. Records of the child-support payments were admitted at trial showing that the payment amounts varied from a low of $41.87 to a high of $131.54. The Mother did not know how long back child-support payments would continue. The Mother stated she applied for disability based on her depression. The Mother later testified

she began receiving payments, but she did not state the amount or provide any supporting documentation. The Mother testified the monthly rent for the proposed apartment is $700. She at first stated the MHMRA and the Salvation Army would pay her rent. The Mother later testified she will not be responsible for the full amount and will be required to pay only $230 or $240. She also testified the Salvation Army would pay her electric bill for up to six months. The Mother provided no documentation to support this agreement or the availability of the apartment other than an undated letter stating an apartment had been approved. The CASA volunteer confirmed with the shelter manager that the Salvation Army would cover the application fee, deposit and three months' rent for an apartment for the Mother. It was unclear what, if anything MHMRA would pay. The CASA volunteer testified the Mother has not obtained employment or demonstrated an ability to live on her own and pay her bills independently in the past, and she was concerned about the Mother's ability to pay rent. In addition, the CASA volunteer was concerned because the Mother received support for a child not in her care and she received assistance from non-profit organizations that could only help for a limited amount of time.

The Mother testified that she had "learned from this" and was going to "keep trying." She asked for a chance to show she had "bettered" herself. Notwithstanding the Mother's protestations that she has changed and wants to care for the Child, the evidence recited above shows she appropriated the Child's identity to set up utilities and has been appropriating the Child's monthly social security checks, which comprise more than two-thirds of her monthly income. These conscious acts of deceit allowed the trial court to conclude that the Mother's stated desire to act in the Child's best interest lacked credibility. We are not to "second-guess the trial court's resolution of a factual dispute by relying on

25

evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

### c. Failure to Complete the Family Service Plan

It was also appropriate for the trial court to evaluate whether the Mother completed her court-ordered service plan for reunification with the Child in reaching its best-interest determination. *See In re E.C.R.*, 402 S.W.3d at 249 (stating findings under subsection O can support the best interest finding); *see also In re A.D.,* 203 S.W.3d 407, 411–12 (Tex. App.—El Paso 2006, pet. denied) (affirming termination under subsection because mother failed to meet her service plan's material requirements including drug assessment, finding a job, and providing a safe home).

The Mother argues on appeal that she completely satisfied the requirements of her court-ordered service plan. We disagree, although the evidence reflects that the Mother made an effort to complete many of her court-ordered services. The Mother provided certificates of completion for outpatient treatment dated February 15, 2013, family counseling dated May 16, 2013, individual counseling dated July 22, 2013, and 8 hours of a Nurturing Parenting Program dated June 1, 2013. The Mother testified she completed anger management classes in December 2012, and that she had learned self-control and motivation. In addition, she testified she has completed the 12-step program and attends both Alcoholics Anonymous and Narcotics Anonymous meetings. She could not describe the twelve steps, however. She testified that she also continues treatment at MHMRA.

The caseworker testified that the Department not only requires attendance at the classes required in the service plan, but the parent must also demonstrate the learned behaviors from these classes. For example, the Mother testified she completed anger management classes in December 2012, and that she had learned

self-control. The CASA volunteer described the Mother's angry outburst after court in August 2013, in response to a question about the Child's care. In addition, the caseworker testified she did not believe the Mother has learned from her behavior and accepted responsibility for her role in placing the Child in the Department's custody.

The Mother had attended most of her visits with the Child, but she had not seen him at all during December or January before trial. She at first blamed her failure to visit on the foster parents. The caseworker denied the foster parents were at fault. The Mother then claimed the holiday interfered with scheduled visits. She then said she had to miss the visits so that she could complete her community service for traffic offenses. Finally, the Mother testified she missed the January visit while making arrangements for the new apartment.

The caseworker testified that her opinion that the Mother's parental rights should be terminated is based in part on the Mother's failure to complete the tasks set out in her service plan, including maintaining a stable home. The CASA volunteer testified that the Mother's parental rights should be terminated because the Mother has not shown the future will be any different from the past. In the CASA volunteer's opinion, the Mother had "demonstrated no insight into how to change to be a more stable parent."

Although the Mother completed many of the tasks set out in the family service plan, she failed to demonstrate learned behavior that would enable her to care for the Child. She failed in the fundamental requirements to provide safe and stable housing and to show she could financially support the Child. By failing to complete these essential components of her service plan, the Mother has not demonstrated an ability to provide the Child with a safe and stable environment. *See In re A.D.*, 203 S.W.3d at 411–12.

Stability and permanence are paramount in the upbringing of children. *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied). A parent's failure to show that she is stable enough to parent a child for any prolonged period entitles the trial court "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.). We conclude the evidence related to the Mother's lack of stability, including her failure to obtain and maintain stable housing before trial, supports the trial court's best-interest finding.

### 3. Child's Desires, Needs, and Proposed Placement

The record evidence reveals that the Child had behavioral issues when he entered the Department's care. The caseworker testified that when the Child first came into the Department's care, he did not act in an age-appropriate manner and spoke like an adult, using street language. He was also aggressive and instigated fights. The Child had been receiving psychiatric care at MHMRA since he was six years old, and he had been prescribed medications for ADHD and stress.

On November 1, 2012, shortly after his removal from the Mother, the Department's caseworker visited the Child at school. He told the worker he liked living at his foster home. He stated he had not had any bad dreams or heard voices in his head since being with the foster parents and he started taking medicine to sleep at night. The caseworker testified the Child is doing well in foster care. She testified that he now acts like a typical eight-year-old boy. His language is more appropriate and he is polite. He also now gets along better with his peers, considers himself a leader, and helps ensure the other children follow the rules.

The Child is behind in school, classified as a "special accommodations"

28

student. The caseworker said the Child is responding to efforts to "get him up to speed." The Department's records reflect the Child received tutoring twice a week, and the foster mother reported that the Child's reading has improved. The CASA volunteer also acknowledged that she had seen progress in the Child. She saw his educational needs being met, which was a big concern because they were not being met before the Department's involvement.

The Department's caseworker testified that in her opinion, the Child was protective of his Mother, he "parents" her, and the Mother looked to him for comfort. The caseworker observed the Mother sobbing during visits and the Child reassuring her that "everything would be OK." The caseworker testified the Mother asked the Child for bus fare at one visit. The Mother denied she asked the Child for money, however. The caseworker felt the relationship between the Mother and the Child was inappropriate.

The CASA volunteer also noted in her report that the Child is very protective of his mother and "very conflicted about whether he wants to go or stay." She testified the Child has become more playful and is less stressed since coming into the Department's care. She acknowledged that the Child loves his Mother and he still worries about her. She agreed with the caseworker's assessment that he is "very protective of her," and in her opinion, the relationship with his Mother is "inappropriate" and "unhealthy."

The Mother testified to her strong bond with the Child. The caseworker acknowledged the Child was excited to see her at their visits. The Mother admitted that the Child told her he was happy at his foster home. The Mother also admitted to making unhealthy choices in her relationships.

The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the child's

best interest. *See J.N.R.,* 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.). Therefore, evidence about the present and future placement of the Child is relevant to the best-interest determination. *See C.H.,* 89 S.W.3d at 28. Plans for adoption are relevant, but evidence about definitive plans are not required to find termination or parental rights is in the Child's best interest. *Id.*

The Child was placed in an adoptive foster home. The Child is close friends with an adoptive child in the foster parents' home. The foster parents have asked for the Child to be placed with them permanently if he is unable to return to his Mother. The CASA volunteer testified that the foster family demonstrates the love and affection the Child needs. The Department's records reflect that the Child's placement provided appropriate supervision, nurturing, and discipline. The Child was reported to have a "sense of comfort, predictability, and safety." The foster parents have a three-bedroom home in a well-kept and quiet neighborhood. Both foster parents are employed as law-enforcement officers.

The Child had been in this first foster home until shortly before trial when the foster mother had a medical emergency requiring surgery. The Child was moved to another foster home while the first foster mother recovered. While the adoption status was considered "currently inactive" at time of trial, the caseworker testified the foster mother's medical crisis had resolved and the foster parents were initiating steps to resume the adoption process. The caseworker testified that it was still the Department's goal for the first foster parents to adopt the Child. The fact finder may conclude that termination will be in the Child's best interest even though adoption plans are not definitive. *See In re C.H.,* 89 S.W.3d at 17.

The CASA volunteer testified the first foster parents had demonstrated to her that they can meet the Child's needs and provide him with love, affection, and nurturing. She believes the Child is bonded to them, he enjoyed their home, he

looks forwarded to returning there, and they protected his best interest. The caseworker testified the Child is very close to the first foster family, but he likes the second home, too.

The evidence related to these factors supports the finding that termination of the parent-child relationship is in the Child's best interest.

### 4. Parenting Abilities

We may also consider a parent's past performance as a parent in evaluating the parent's fitness to provide for the Child and the trial court's determination that termination would be in the Child's best interest. *See In re C.H.*, 89 S.W.3d at 28. The Mother has two older children. One is an adult son and the other is a son who does not live with her but instead resides with his father and paternal grandmother. The Mother acknowledged that she did not raise either of the older children.

The evidence of the Department's investigations for abuse and neglect of the Child is recited above. Although evidence of past misconduct or neglect alone may not be sufficient to show present unfitness, a fact finder may measure a parent's future conduct by her past conduct and determine that it is in a child's best interest to terminate her parental rights. *See In re A.N.D.,* No. 02-12-00394-CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.).

The Mother testified that when the Child was in her care, she always made sure he took his medications. The Mother also testified that the Child's nickname was "Lazy." The Mother testified she gave the Child money, from $40–$50 each visit, or $100 a month, but the caseworker had never witnessed it or observed the Child leave with any money. The caseworker acknowledged the Mother brought snacks to visits. She remembered the Mother bringing socks and leaving a pair of shoes for the Child for the previous Christmas in 2012. The Mother did not see the

Child the Christmas before trial, however.

This limited evidence related to any positive parenting abilities of the Mother supports the trial court's finding that termination of the parent-child relationship is in the Child's best interest. *See H.N. v. Dep't of Family & Protective Servs.*, 397 S.W.3d 802, 814 (Tex. App.—El Paso 2013, no pet.) (stating the father's failure to demonstrate his parenting abilities supported the finding that termination was in the best interest of the child).

After considering the relevant factors under the appropriate standards of review, we conclude this evidence supports the trial court's best-interest finding. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (considering the parent's drug use, inability to provide a stable home, and failure to comply with his family service plan in holding evidence supported the best-interest finding). Specifically, viewing all the evidence in the light most favorable to the judgment, we conclude that a factfinder could have formed a firm belief or conviction that termination of the Mother's parental rights is in the Child's best interest. *See J.F.C.*, 96 S.W.3d at 265–66. And, in light of the entire record, we further conclude that any "disputed evidence that a reasonable factfinder could not have credited in favor of the best-interest finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction" that termination of the Mother's parental rights is in the Child's best interest. *See In re H.R.M.*, 209 S.W.3d at 108. Therefore, we hold the evidence is both legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in the Child's best interest. *See* Tex. Fam. Code § 161.001(2). We overrule the Mother's first issue.

## IV. CONCLUSION

We have determined that legally and factually sufficient evidence supports

the trial court's finding of at least one predicate ground for termination and that termination of the Mother's parental rights is in the best interest of the Child. Therefore, the trial court's judgment is affirmed.


/s/ Sharon McCally
    Justice


Panel consists of Chief Justice Frost and Justices Boyce and McCally.